IN THE UNITED STATES DISTRICT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | | |
|---|---|---|---|
| S.S., | § | | |
| | § | | |
| *Plaintiff*, | § | | |
| | § | | |
| V. | § | NO. | 24-CV-1055 |
| | § | | |
| SCOTT ASH JAMES ZIRUS, | § | | |
| CAMP STEWART FOR BOYS, INC., AND | § | | |
| AMERICAN INSTITUTE FOR FOREIGN | § | | |
| STUDY, INC. D/B/A CAMP AMERICA | § | | |
| | § | | |
| *Defendants*. | § | | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

---

COMES NOW, Plaintiff S.S., and Defendants Scott Ash James Zirus, Camp Stewart for Boys, Inc., and American Institute for Foreign Study, Inc. d/b/a Camp America, as follows:

### A.   Parties

1.   Plaintiff S.S., is a resident of La Grange, Fayette County, Texas.[1]

2.   Defendant, Scott Ash James Zirus ("Zirus"), is an individual currently incarcerated in the Texas Department of Corrections.  This Defendant may be served with process via certified mail, return receipt requested at Texas Department of Corrections, Robertson Unit, 12071 FM 3522, Abilene, Texas 79601, SID No. 08432563.

3.   Defendant Camp Stewart for Boys, Inc. ("Camp Stewart"), is incorporated under the laws of the State of Texas.  Defendant has its principal place of business in Texas.  Defendant

---

[1]   Plaintiff has used initials in order to protect his right to privacy. *See* Fed. R. Civ. P. 5.2(a)(3); *see Villanueva ex. rel. M.V. v. San Marcos Consol. I.S.D.*, 2006 WL 2591082, at n. 1 (W.D. Tex. 2006) ("Because M.V. is a minor, the Court, pursuant to this District's privacy policy, will use only the initials of M.V.").

---

may be served with process by serving its registered agent Silas B. Ragsdale, Jr., at 612 FM 1340, Hunt, Texas 78024-3024.

4.      Defendant, American Institute for Foreign Study, Inc. d/b/a Camp America ("Camp America"), is incorporated under the laws of the State of Delaware. Defendant has its corporate headquarters in Connecticut.  Defendant is required by to designate or maintain a resident agent in this State for service of process and has not designated such agent. Specifically, Defendant is a non-resident foreign corporation, was engaged in business in Texas at the time of the incident, does not maintain a regular place of business in Texas, has not designated a registered agent for service of process, and the present lawsuit arises from Defendant's business in Texas. Therefore, the Texas Secretary of State is the agent for service of process for the Defendant.  The Texas Secretary of State may serve process on Defendant by serving American Institute for Foreign Study, Inc. d/b/a Camp America through its registered agent Corporation Service Company at 251 Little Falls Dr., Wilmington, Delaware 19808, or wherever it may be found.

## B.    Jurisdiction

5.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 for the causes of action asserted against Defendant Zirus pursuant to 18 U.S.C. §§ 2241(c), 2255(a).  Because the state law causes of action asserted against the other Defendants arise out of the same operative facts, this Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. §1367(a).

## C.    Venue

6.      Venue is proper in this district because this civil action is brought where a defendant may be found and a substantial part of the events or omissions giving rise to the claim occurred in this district. *See* 28 U.S.C. § 1391(b).

---

**PLAINTIFFS' ORIGINAL COMPLAINT**                                      **PAGE 2 OF 27**

**D.    Facts**

<u>*S. S.*</u>

7.      S.S. attended Camp Stewart during the Summer of 2009. He was assigned to a cabin in which Scott Zirus was the lead counselor. During his stay, S.S. was sexually abused by Zirus on several occasions.

8.      Several other boys who shared the same cabin as S.S. also reported that Zirus sexually abused them. Zirus was charged with sexually abusing two of those boys and later plead guilty to the charges.

9.      S.S. was 7 years old at the time of the sexual abuse. Due to his young age, he did not fully understand the nature of the abuse and why he had been targeted by Zirus. However, as S.S. matured and reached puberty, he struggled with the memories of the sexual abuse and tried to understand why he had been selected for it. This emotional turmoil confused his budding sexuality and caused him to have flashbacks and question his own sexual identity. This emotional turmoil impacted his relationship with his parents and friends, his ability to concentrate and his school work. S.S. has been struggling with depression and psychological trauma as a result of Zirus' sexual abuse.

10.     S.S. has suffered the effects of sexual abuse noted by numerous medical and crime victim organizations. As noted by the National Centers for Victims of Crime, S.S. has experienced feelings of being powerless, ashamed and developed a deep mistrust of others. And, as a victim of child sexual abuse, S.S. will remain at risk that he in turn will abuse children for the rest of his life. His abuse has triggered anger at the adults in his life who he feels could have avoided the abuse and betrayed by the fact an adult in which he placed trust caused him harm. S.S. also struggles with thoughts that he has been stigmatized by the abuse and that something inherent in his own personality is responsible for Zirus selecting him as a victim.

*Scott Zirus*

11.     Scott Zirus is currently serving a 40-year sentence after pleading guilty to charges he sexually molested 5 and 6-year old boys while working at Camp Stewart in 2009.  Zirus is an Australian citizen. He came to Texas from Australia to work at the camp through a job placement program operated by Camp America.

12.     Zirus is currently under 10 criminal indictments in Australia for sexually abusing at least four young boys in that country. When he completes his Texas sentence, Zirus will be returned to Australia to face those charges.

13.     Zirus was arrested in the San Antonio airport after law enforcement received reports that he molested two other boys who had attended the camp at the same summer as S.S. Investigators confiscated his lap top computer and camera equipment. Tests showed that the computer contained numerous images of child pornography featuring young boys. Zirus' camera also contained numerous photographs he took of young boys in various states of undress. Investigators also found Zirus had taken identification cards and information about several boys who had been in his cabin that summer. These documents included materials pertaining to S.S.

14.     Zirus told investigators that he had received medical treatment for his attraction to young boys during a two-year period while he lived in Australia. He told them he was receiving medication to control sexual urges he had for young boys.

15.     Records show Zirus was unemployed and homeless while living in Australia. His only work experience listed described a business he ran taking disadvantaged young boys on camping trips. Australian authorities have filed charges against him there for molesting at least four boys during these camping trips.

16.     Prior to coming to Texas, Zirus had blogged extensively about a new religion he had created, Shadoran, and the religious teachings about love between adults and children. These postings reflected a dangerous attitude towards sexual attraction to young boys. Zirus' manifesto was posted on numerous websites including MySpace and he blogged regularly about his newly-created religion prior to his trip to Texas.

17.     A Google internet search of Zirus' writings revealed his beliefs. They included statements that it was "a fact that 8 out of 10 boys are bisexual but only 2 out of these 8 will ever admit it." Zirus also wrote "I am a Shadoran and we have a special 'sexuality' called 'neltia' (r'neltia for male and l'neltia for female) – this 'sexuality' is unique because it has no boundries (sic). You are open to love from ANY age, race or gender . . . I will love whom ever I love."

18.     While Zirus denied molesting children in Australia when interrogated by Texas law enforcement officers, he admitted that he thought it would be "less risky" to do so in Texas because he would be returning to Australia when the summer ended.

19.     Zirus was sued in Federal court by several of his other victims. The Court determined that there was evidence Zirus had crossed state lines with the intent to sexually abuse and molest minors.

*Camp Stewart*

20.     Camp Stewart's marketing materials touted its safety and claimed the people working there were carefully selected for their outstanding character to serve as role models for young boys. But the truth is that it employed people with criminal arrest histories, some who searched the internet for sex with "younger looking guys" and outsourced much of its hiring to outside companies that did little to vet applicants.

21.     In lawsuits filed after Zirus was arrested, evidence showed Camp Stewart ignored its own policies and procedures designed to keep campers safe from pedophiles like him. First,

there was evidence that Camp Stewart ignored its written policies requiring any camp counselor to provide three written references and that those sponsoring the references be checked before a counselor could be hired. Zirus, for example, provided only two references (one of which was unsigned) and there was no evidence anyone bothered to verify that they were authentic.

22.     Camp Stewart also violated its policies and procedures regarding the safety of the cabins where young boys slept. It failed to enforce policies that prevented counselors from creating hidden areas within the cabins and failed to enforce rules requiring adult counselors from being left alone and unsupervised with children in the cabins. Zirus hung flags around his bunk area which effectively prevented other counselors from seeing him. Zirus admitted to investigators that the sexual abuse took place in this area and was facilitated by the fact he knew other counselors could not see what he was doing. The evidence in the other cases showed that camp managers were informed about Zirus' suspicious activity but they took no effective steps to protect the young boys in his cabin.

23.     Despite its claims that Camp Stewart employees were selected to be good role models, it employed men with criminal histories of sexually-related crimes in key management positions. For example, Roy Spears was a Camp Stewart employee in charge of hiring and managing the counselors. Spears had a history of arrests for prostitution, pimping and indecent exposure related to seeking anonymous sex with men in public places. Court records show Spears pleaded guilty to prostitution in 1993 and no contest to indecent exposure in 2002 after he was caught masturbating in public.  Camp Stewarts owners were aware of Spear's criminal activity but did not fire him. Spears resigned from the camp and was replaced by Thomas Cochran. He left the camp after it was revealed he had been posting nude pictures of himself on

internet sex search sites. Cochran's profile indicated he was searching for sex with "younger looking guys, frat boys" while he was director of Camp Stewart's male camp counselors.

24.     Evidence in the earlier cases showed the camp owner, Jeeper Ragsdale, also has an extensive history of criminal arrests. Between 1989 and 1991, Ragsdale was charged with a variety of crimes including reckless conduct, resisting arrest, possession of drug paraphernalia and driving while intoxicated.

25.     Camp Stewart attorneys sought to keep the history of arrests and criminal activity out of the prior cases but the court ruled it was "directly relevant" noting that Camp Stewart's promotional literature assured parents "we only have people of good moral character. They're all screened."

*Camp America*

26.     Camp America was a company that placed making profits over the safety of children served by the counselors it provided to U.S. camps. The evidence showed that Zirus was not the only Australian counselor hired through Camp America to be accused of sexually molesting a child that summer.

27.     Camp America makes its money from both sides of the camp counselor business. First, it advertises to U.S. camp owners that it can provide them with a ready source of qualified counselors to meet their staffing needs. Camp owners pay for access to the list of counselors Camp America develops for them. Camps also pay Camp America when they hire a counselor through their program and pay a premium for candidates with special skills.

28.     Camp America makes money off the applicants to its employment programs. It charges them for apply for U.S. camp jobs and offers to sell them airfare and insurance. Camp America purchases bulk airfare at a discount and turns around and sells those seats to counselors coming to America through its programs.

29.     To help ensure its applicants get U.S. jobs, Camp America trained its "screeners" to write up glowing reports about the applicant's qualifications and to recast negative traits in a light most positive to impress camp owners.

30.     Camp America's internal literature indicated it was aware of the danger pedophiles would be attracted to its program because it provided access to potential young victims. While it's screener handbooks outlined the danger, Camp America made no effort to train them on how to identify or evaluate an applicant to prevent pedophiles from using their system. Instead, Camp America provided screener training on how to best market and package all applicants to ensure the maximum number got hired.

31.     Camp America ignored its own policies and procedures with respect to Zirus. Its documentation claimed all counselor applicants were required to provide at least two signed references before they could be considered for any job. Zirus provided only one signed reference which did little to describe or address his suitability to work around children. Camp America's Australian screener for Zirus was a personal acquaintance of him. However he was unaware of the medical and psychological counseling Zirus had been seeking for his sexual attraction to young boys.

32.     Zirus was sent to Camp Stewart through a Camp America, a for-profit program operated by the American Institute for Foreign Study.  Camp America is a corporation that specializes in finding foreign individuals who wish to work as camp counselors and matching them with camps in the United States that need counselors.  In July 2008, Camp America and Camp Stewart entered into a written contract in which Camp America agreed to supply counselor candidates and provide their transportation to Camp Stewart.

33.     Camp America relies on a network of unsupervised independent contractors to conduct screening of counselor candidates. In Australia, the contractors sit in on three interviews, are provided a handbook and paid $60 AU per interview to conduct the screening. The Interviewer Handbook describes the role of these independent contractors as ". . . pre-selectors, assessors, publicity agents, information-givers, experience providers and spokespeople – they play an integral part in the whole application process." Interviewer Handbook page 40.  The Handbook goes on to note that ". . . the most important aspect of being an interviewer is choosing the right people! Pre-selection is essential. Our reputation is based on our ability to provide camps with appropriate, quality staff and that selection rests with you. The Camp America application procedure is set-up to aid the interviewer in pre-selecting effectively and efficiently. You are often the only Camp America representative who meets face-to-face with an applicant prior to their participation on our programme." Interviewer Handbook page 41.

The Interviewer Handbook specifically warns its independent contractors that child abusers would be attracted to their program because of the access it would give them to potential victims. It tells interviewers that their role ". . . is to be the first line of defence in detecting unsuitable candidates who may potentially have problems being in close contact with children." Interviewer Handbook page 21. The Handbook goes on to describe specific issues that interviewers should examine to help weed out potential pedophiles from access to the program.

34.     Applicants to the Camp America program are required to provide two references. Camp America allows the applicants to upload the references themselves rather than requiring confidential references which would provide an opportunity for more candid and revealing information to be gathered. The independent contractors are instructed to coach the candidates about whole they should get references from and what they should say to improve their chances of being hired by a camp. The Handbook stresses the import role references play in the program

stating "**<u>We can't reiterate enough</u>** that unsuitable references are the main cause of applications being kept on hold! . . . Camp America is very strict on reference requirements. References failing to meet all of our requirements will not be accepted." Interviewer Handbook page 26.

35.     The Handbook describes the requirements that all references must meet. In part, the requirements include that the references be "signed and dated" and that they must be done by someone "who has known the applicant in a professional capacity for a minimum of six months and states this on the reference." Interviewer Handbook page 27.

36.     While the Handbook reflects the importance of the references, it only requires its independent contractors to actually verify only 3 references over the course of the hiring season. Camp America relied on Mark McNaughton to interview Zirus. He was a long-time independent contractor for Camp America and worked in Perth in the Australian state of Western Australia without direct supervision by full-time Camp America employees. Mr. McNaughton said that he spent about an hour and a half interviewing Zirus but did not make any attempt to check his references since they had not been provided prior to the interview. Of the Camp America policy requiring independent contractors to check references, Mr. McNaughton testified that he had not followed the policy for many years and that no one from Camp America required independent contractors to check any references.

Q:     And has that – when you say – what time frame are we talking about when you did that?

A:     I would say the last time that I actively personally checked a reference would have been 2003/2004.

Q:     So prior to that, were you, as part of your interview work, actually checking references for people, for applicants that you were processing?

A:      Again, it was not – it was not an expectation of the interviewer in their role to go back and check references. The responsibility of the interviewer is to check presentation.

37.     A review of the two references that Zirus provided to Camp America demonstrates that they did not meet Camp America's requirements. One of the references was unsigned. Neither reference was from someone who knew Zirus in a professional capacity. Mr. McNaughton said he knew of no one from Camp America that checked to verify either of Zirus' references.

38.     Mr. McNaughton also said that no one called to verify any of the employment claims or other details that Zirus included in his application. Instead, Mr. McNaughton took the information Zirus gave him about his credentials, exaggerated some of it and packaged it to be more entertaining to potential employers.

Q:      The next sentence you write: "One might raise an eyebrow at any man who felt compelled to leave home at the tender age of 14." Why would you raise an eyebrow at that?

A:      That turn of phrase is certainly me trying to engage the reader. I'm sure you can appreciate that I am a somewhat articulate person who enjoys writing, and I do think about who is going to be reading what I write and therefore I make an effort to make it an engaging rather than just another report. So my choice to use those – my decision to use those words would have been created to try and engage the reader.

39.     Mr. McNaughton later became Facebook friends with Zirus and went rock climbing with him. He did not, however, make any effort to investigate Zirus' writings on line. For several years, Zirus had written about a new religion he created called Shadoran. Among

those writings were postings about the new sexuality that the Shadoran religion acknowledged which allowed sex between ". . . ANY age, race or gender."  Dennis Reagan, an Camp America vice president, read these materials after Zirus was arrested and said that they alone would have been enough to keep him out of the program. He said:

> A:  When I heard that there was online activity, I looked and had my staff look. And yes, we did find some – the word "shadow" comes to mind, and some very disturbing language attached to that particular moniker, if you will. And I looked at it thoroughly. I don't think I made copies, I just read it all.
>
> Q:  And what was it about that that you found disturbing – to be disturbing language?
>
> A:  It just – it just talked about boundaries or lack thereof. And in the context of the allegations, it was disturbing.
>
> Q:  What type of boundaries? He – he was prolific?
>
> A:  Yeah. And the – the gist of it were that in this fantasyland, there were no boundaries.
>
> Q:  Would that kind of information have been something that you think would have deselected Mr. Zirus as an applicant had it been known?
>
> A:  I certainly hope so.

40.     Bob Ditter, a frequent writer and lecturer in the camping industry, said that by failing to check Zirus' references, failing to verify his employment and volunteer work claims and failing to check his presence on the internet, Camp America violated the industry's safety standards.

___

Q:      So in this case, when the references for Mr. Zirus were not checked, did
        Camp America meet the standard that you think applies to them?

A:      No. They should have checked the references.

Q:      Is the standard for Camp America, in your opinion, that candidates like
        Mr. Zirus' employment claims should be verified?

A:      Yes.

Q:      Was that standard followed in this case?

A:      No.

Q:      Are those safe practices?

A:      They're not – safe practices?

Q:      Right.

A:      I would have to say, no.

Q:      Why not?

A:      Because there is no way of – well, let's be specific. Checking the
        references or not checking the references means that the authenticity of the
        references could not be verified.

Q:      Is it safer, when evaluating the suitability of a candidate, to verify their
        employment claims or not verify their employment claims?

A:      To verify.

Q:      Is it safer, when assessing the suitability of a candidate, to check their
        references or not check their references?

A:      To check.

Q:      If the choice is made not to check references, is that a safe choice?

A:      It's a less safe choice.

41.     Camp America also failed to administer tests to applicants that could help predict the threat that they might sexually abuse children. Dr. Gene G. Abel, with the Behavioral Medicine Institute of Atlanta, has developed a test to identify candidates who should not be working with children. For several years before Zirus applied to Camp America, Dr. Abel has been offering the test in Australia and several other countries including the United States. The test taker answers questions on line and the results are reviewed and produced in less than 30 minutes. Dr. Abel's test has been used for almost a decade by churches and other youth-related organizations to prevent pedophiles gaining access to children.

42.     Had anyone checked, they would have found Zirus' past was littered with warnings signs about the threat he posed. Under questioning by Kerrville Sheriff's investigators after his arrest, Zirus admitted being sexually attracted to young boys from an early age. He told investigators that he was forced to leave home around age 14 because his mother abused drugs. From there, he described living in foster homes, abusing alcohol and struggling with his sexual attraction to young boys. Zirus told investigators that he sought out medical treatment when he was 20 years old to help curb his sexual interest in young boys. Zirus told investigators that he was living below the poverty line, surviving on government assistance checks and living in a tent or with acquaintances with no permanent address.

43.     These facts were in line with the Camp America Interviewer Handbook sections which warned their independent contractors about specific red flags associated with potential pedophiles. They included warnings about an applicant's history of frequent address changes, history of the applicant's own physical or sexual abuse and the inability to maintain adult relationships or steady employment. Zirus' Camp America application contained numerous clues about these issues but there is no evidence anyone made an effort to inquire into them.

44.     In the earlier cases, Camp America argued its contract with camp owners absolved them of all responsibility for the appropriateness of the counselors it helped place. The company claimed it had no duty to protect young campers exposed to the counselors it provided. But the Court ruled that it owed a duty to the victims in that case because of its knowledge of the risk and the simple steps it failed to take to avoid them.

### E.     Causes of Action Against Defendant Zirus

### Section 2241(c)

45.     Defendant Zirus sexually assaulted the minors who attended Camp Stewart for Boys.  Zirus pled guilty to these offenses and is currently serving 40 years in the Texas Department of Corrections.  By crossing a state line with intent to engage in a sexual act with a minor under age 12, Zirus violated 18 U.S.C. § 2241(c).  Plaintiffs are granted a private right to bring this cause of action pursuant to 18 U.S.C.§2255(a).  That private cause of action entitles the minor Plaintiffs to recover actual damages, which are presumed to be no less than $150,000, and reasonable attorney's fees.

### Sexual Assault and Battery

46.     Defendant Zirus intentionally, knowingly and recklessly made contact with the minor Plaintiffs and caused them injury. Defendant Zirus also committed battery, which is the offensive touching of the minor Plaintiffs.  For those reasons, the minor Plaintiffs are entitled to recover actual damages, including past and future mental anguish, and exemplary damages.

### Intentional Infliction of Emotional Distress

47.     Defendant Zirus' conduct in sexually assaulting, sexually molesting, and sexually abusing the minor Plaintiffs was extreme and outrageous, it was done intentionally or recklessly, and it proximately caused the minor Plaintiffs severe emotional distress.  The Defendant Zirus' conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized society. Defendant Zirus' intentional infliction of emotional distress was the proximate cause of the minor Plaintiffs' actual damages, and also entitles the minor Plaintiffs to exemplary damages.

### F.    Causes of Action against Camp Stewart

#### Fraud

48.    Defendant Camp Stewart for Boys made false representations about the safety of its camp, the quality of its counselors and the camp's efforts to check out those counselors prior to employment.   Camp Stewart for Boys represented that it thoroughly checks counselor's backgrounds prior to employment.   This representation was false when made and was made knowing parents would rely on it when deciding to entrust their son's safety to Defendant.   As a result of reliance on these misrepresentations, Plaintiffs suffered damages.

#### Negligent Misrepresentation

49.    Defendant Camp Stewart for Boys negligently represented the nature of its efforts to check out counselors prior to employment.   The Defendant represented that counselors were required to provide at least three references before they were employed.   These representations included the statement "We must have at least 3 references on hand before (sic) can make you a job offer."   Defendant Camp Stewart for Boys has never produced any references it obtained for Zirus.   The only records produced show only one reference was ever obtained.   Defendant negligently misrepresented to parents that their children would be protected by diligent efforts to investigate counselor's backgrounds.   Plaintiffs suffered damages as due to this negligent misrepresentation.

50.     Specifically, as required by Fed. R. 9(b) Plaintiffs would show that in the weeks prior to making the decision to send their sons to Camp Stewart, the camp and its employees – including Jeeper Ragsdale and Kathy Ragsdale, made statements and published numerous materials containing numerous falsehoods about the quality of the counselors working at the camp, the nature of the screening and pre-employment checks done on counselors and the nature of the safety conditions at the camp. The statements were made in oral conversations with the Plaintiffs, in written materials sent to the Plaintiffs in the form of brochures and "frequently asked questions" advertising materials and on the Camp Stewart for Boys web site. These statements were delivered to the Plaintiffs' homes and viewed by them through their computers. The Plaintiffs allege that Camp Stewart for Boys made numerous false statements. They include claims that the camp counselors working with their six and seven year old boys would be thoroughly screened before being offered a job, be subjected to a personal interview, be required to produce at least three written confidential references, be required to have completed at least one year of college and to be of high moral character.

51.     The evidence shows that the statements were made in numerous locations including these specific examples:

"**Statement from Parental Notes**"

52.     Why Select Camp Stewart? Why should you select Stewart for your child? This folder is designed to help answer that question as well as to address some of the most frequent questions/concerns heard from prospective parents."  "Stewart's Commitment – Camp Stewart's goal is to provide the very best camping experience for each and every boy. A Christian-oriented, non-denominational private camp based on Judeo-Christian principles, Stewart's purpose is to offer wholesome fun and growth to boys 6-16 in a protected environment.  Stewart strives to have role model counselors who are good mentors for growing and impressionable

young men. They are carefully selected, screened thoroughly and go through an extensive training orientation prior to camp."

**"<u>Common Questions & Answers</u>**

53.    Q) First, what is an organized camp?

A) It's a family unit, on a large scale. Camp provides a protected, structured environment where one learns skills, develops independence, greater tolerance for others, makes life-long friends, strengthens core values, learns to set and work towards goals, develops a deeper appreciation for the environment and Creator and more. It is a '*time out*' from the stress and violence of today's world."

54.    "Q) What makes Stewart stand out from other camps?

A) . . .  Commitment or Creed:  Camp Stewart's goal is to provide the very best camping experience to each and every boy.  . . . Stewart's purpose is to offer wholesome fun and growth to boys 6-16 in a safe protected environment.    Stewart strives to hire role model Counselors who are good mentors for growing and impressionable young men. They are carefully selected, screened thoroughly and go through an extensive training orientation prior to camp."

55.    "Q) What are the Requirements for Applying?

A) Minimum age requirement is one year of college and minimum age of 18; good moral character and suitability to be a role model for impressionable youth."

56.    "Stewart is Committed To:  Partnering with Parents  . . .  Stewart summer staff is carefully selected and undergoes extensive pre-camp training. Activity instructors are appropriately trained and certified. Year-round staff participates in continual professional

development and growth striving to stay abreast of new developments and knowledge in an effort to stay at the forefront of the camping industry."

57.    "Safety rules and practices are enforced. Campers are carefully supervised at activities as well as in cabins. A former Texas Health Department spokesman told us boys are safer at camp than at home or school."

**"Among the Most Frequently Asked Questions**

58.    Q) Why should I select Stewart?

A) because in addition to fun, friendships and lifetime skills, we're teaching goal setting and leadership (through the unique Advancement program); stressing increased self-esteem; communicating with parents through written reports more frequently than anyone we know; hiring role model counselors then giving them extensive training, plus providing 'extra' clinics and more. Stewart goes the extra mile to ensure a protected environment by being ACA certified to be sure it more than measures up to the industry standards in all respects."

59.    "Q) How are Stewart counselors selected?

A) A criteria of 'would I want this person as a role model for our son or grandson?' is used. Each prospective staff member is personally interviewed, three written references are required and background checks are performed. Stewart staff comes from around the world, as well as U.S. universities and colleges. Staff normally are at least 18, have completed at least one year of college or the two year Stewart Leadership Development program."

60.    "Q) What training do counselors have to work with boys?

A) A comprehensive orientation program as well as certification programs are required. Exit exams are given. During orientation, the staff is trained how to deal with different camp situations, how to handle unexpected emergencies, etc. Senior staff gets to know each new

staffer prior to the arrival of campers. The bottom line: every effort is made to hire only the most outstanding counselors and staff, then to provide them with the tools and know-how they need to be successful. Are all staff perfect? No, camp is life and we mis-judge some times. When that happens, we sever the camp relationship."

### "Counselors Eligibility

61.     Applicants must be at least 18 years of age; completed one year of college and be of high moral character. . . . Male staff members must be emotionally and mentally capable to live in camp cabins with boys 6-16."

### "Counselor Web Pages

62.     Now that you know much more about being a counselor, return the completed application and ask persons completing references to send them directly to Stewart. We must have at least 3 references on hand before (sic) can make you a job offer."

### "Staff Application – Important Data

63.     Applicants should be at least 18 years of age, completed one year of college and be of high moral character. . . . All staff members should be emotionally and mentally suitable to live and work with boys 6-16."

          To be offered a contract, at least three written references must be on file. Remind your references to submit their forms directly to the camp ASAP. These are confidential; you should not see them."

### "Camp Stewart for Boys Confidential Reference Form

64.     Return directly to Stewart: Do not give to applicant. . . . A very honest and frank appraisal of this applicant and his/her suitability to work with boys 6-16 would be appreciated.

---

Please mail directly to Jeeper Ragsdale. . . . **Three written references are required before a contract can be offered so your promptness is appreciated**. (Emphasis in original)."

65.     The statements were sent to the Plaintiffs on Camp Stewart for Boys letterhead, published on the Camp Stewart for Boys website, and included in other promotional materials disseminated by Camp Stewart for Boys. In many instances, the statements were attributed to "the Ragsdale family" as the author.

66.     As demonstrated by the facts in this case, the statements were materially untrue and were known to be untrue at the time they were made by the Ragsdale family. First, it is undisputed that Zirus did not meet the minimum eligibility requirements described in Camp Stewart for Boys' materials. The evidence shows that he did not attend any college.  Second, there is no evidence that Zirus even provided three written confidential references prior to being offered a job at Camp Stewart for Boys. In fact, the evidence shows that Camp Stewart for Boys hired Zirus without receiving <u>any</u> confidential references for him.  Mike Busby, the employee at Camp Stewart for Boys alleged to have actually hired Zirus, testified that they did not require confidential written references for Zirus and never actually checked any references for any counselor candidate.

67.     Third, the evidence shows that Camp Stewart for Boys did not make any effort to thoroughly screen Zirus or check his background prior to offering him a job. The evidence shows that the decision to hire him was made by Jeremy Tyzack, a former camp counselor with no experience or training in hiring or screening new employees. Emails between Tyzack and Kathy Ragsdale show that Tyzack hired Zirus less than a week after he himself was hired to find new employees. There is no evidence that Tyzack ever actually met with Zirus before hiring him or that he conducted any background check.  Mike Busby, the hiring director, testified as follows:

Q:     At the time you made the decision to hire Scott Zirus, did you check to see if he had attended any college?

A:     No, sir.

Q:     At the time you made the decision to hire Mr. Zirus, had you talked to any of his prior employers?

A:     No, sir.

Q:     At the time you made the decision to hire Mr. Zirus, had you conducted any criminal background check?

A:     No, sir.

Deposition of Mike Busby Pgs. 9-10.

68.    Q:     Did you, for the staff that you hired, ever check a personal reference?

A:     Not that I recall.

Q:     To your knowledge, for the domestic staff, did anyone from Camp Stewart ever check a personal reference?

A:     Not to my knowledge.

Q:     So with respect to references, you personally would not ever go back and check on any of your candidates whether the references said what they were purported to say in the reference, correct?

A:     In regard to international staff?

Q:     Yes, sir.

A:     No, sir.

Q:     With respect to any – in the time you've been doing this, have you ever checked a personal reference for a camp counselor candidate?

A:      Not that I recall on an international staff, no sir.

Q:      And to your knowledge with respect to the domestic staff, has anyone ever

        actually checked up on a personal reference?

A:      Do I know specifically if anyone has?

Q:      Anecdotally or specifically.

A:      Not to my knowledge.

Q:      And basically the references just sit in the file for the individuals, correct?

A:      They do go in the file, yes sir.

Deposition of hiring director Mike Busby pages 67-68.

69.     Fourth, the evidence shows that Camp Stewart for Boys did not provide a
protected and safe environment as promised in its promotional materials. The evidence shows
that it repeatedly ignored safe practices and the camps own written policies about cabin and
counselor safety. Specifically, the Defendant tolerated Zirus' decision to place his bunk inside
the section reserved for the young campers and outside of the view of other counselors and
supervisors – something inconsistent with industry standards and its own policies. It also allowed
Zirus to hang a flag obscuring the view into his bunk area despite clear written policies against
the practice. And, it allowed Zirus to be alone at night in the cabin with the boys he assaulted,
again a violation of its own safety policies.

70.     Camp Stewart for Boys' multiple misrepresentations about the qualities of their
counselors, the steps taken to screen them and the protected environment in place at the camp
directly induced parents send their children to the camp and pay for their services. Camp Stewart
for Boys' misrepresentations allowed them to increase their profits by failing to actually provide
the services it claimed it would deliver and perform the thorough screening services they
promised, instead relying on ill-trained and inexperienced former counselors to do their hiring.

This unjustly enriched the Defendants as the risk of creating a dangerous environment for the young boys attending the camp.

### Negligence Claims Based on Hiring or Supervising Employees

71.     Defendant Camp Stewart for Boys breached its duty to use ordinary care in hiring and supervising its employees, including Defendant Zirus.  Defendant Camp Stewart for Boys failed to take reasonable steps to independently investigate Defendant Zirus' background relying instead on Defendant Camp America to do the work.  Evidence shows Camp America apparently also failed to conduct any independent investigation of Defendant Zirus, relying instead on unidentified third parties.  Plaintiffs suffered damages as a result of this breach of duty.

### Negligence

72.   Defendants Camp Stewart for Boys, and Camp America were negligent in hiring, supervising, training and retaining Zirus as a camp counselor at Camp Stewart for Boys.  Further, Defendants are liable for failing to warn the minors and their parents about the foreseeable risks of sexual abuse.  Defendants' negligence was a proximate cause of Plaintiffs' actual damages.  And, because the Defendants were guilty of gross negligence or malice, Plaintiffs are entitled to exemplary damages.

### Breach of Fiduciary Duty/Aiding and Abetting

73.   Because of being in loco parentis to the Plaintiffs, Camp Stewart for Boys owed a fiduciary duty to Plaintiffs. Not only is that a formal fiduciary relationship, but the parties also had an informal fiduciary duty arising from the extreme trust and confidence reposed in the safety and security of the overnight camp.  Camp Stewart for Boys breached its fiduciary duty by failing to put the interests of Plaintiffs ahead of its own and by failing to disclose all material facts to Plaintiffs and their parents.  Camp America is liable for aiding and abetting Camp

Stewart for Boys' breach of fiduciary duties. Camp Stewart for Boys' breach of fiduciary duties caused the minor Plaintiffs to suffer actual damages, for which the Defendants are liable.  The minor Plaintiffs are also entitled to recover exemplary damages and equitable remedies, including disgorgement of fees.

### E.  CAUSE OF ACTION AGAINST CAMP AMERICA

74.     Defendant Camp America was negligent and breached its duty to use reasonable care in the screening of its applicants and recommending them for placement with U.S. camps like Camp Stewart. Defendant Camp America owed the Plaintiffs the duty to use reasonable care in selecting, interviewing, vetting and screening candidates to their program. According to its own Interviewer Handbook, Camp America was aware that participants in its program posed a foreseeable risk of sexual abuse to the young boys attending camps that it helped staff. The Handbook demonstrates that Camp America was aware of the general risk of sexual abuse that the nature of its program – placing adults in camp counselor positions where they would work with children. It was foreseeable to Camp America that pedophiles like Zirus would be attracted to their program because of the access the jobs it touted would provide them to potential victims.

75.     Given the particular susceptibility of young children, like the boys involved in this case, Camp America had a duty to use reasonable care in screening applicants to their program. Camp America had the power to deny pedophiles like Zirus entry into their program and assist camp directors in obtaining information relevant and necessary to fully evaluate the threat applicants posed. Camp America agreed to work with camps like Camp Stewart to facilitate placement of participants in their program in those camps. As a result, Camp America had a duty to act reasonably when recommending participants to American camps. The burden of imposing the duty is small in light of the fact that Camp America has already undertaken a duty to perform some of the screening of its program's participants.

76.     Camp America violated this duty when it failed to follow its own policies concerning references, failed to follow industry standards regarding reference checks, employment checks, volunteer work checks and internet checks.

77.     Camp America's actions were a cause in fact of the Plaintiffs' injuries. According to its own employees, Zirus' application did not meet their own standards because his references were not sufficient and his internet postings, had any effort been made to check them, would have revealed disturbing content that would have eliminated him from the program.

78.     Camp America was also grossly negligent in its failure to properly screen Zirus. It failed to follow its own policies and procedures concerning his application and failed to adhere to industry standards concerning the safe screening of camp employees. By failing to make any effort to check references, verify employment claims or investigate Zirus' volunteer work, Camp America deliberately ignored sources of information that would have revealed the true nature of Zirus' personality and the significant threat he posed to young boys. As a result of this gross negligence, the Plaintiffs are entitled to exemplary damages.

79.     As a result of Defendant's negligence, the minor Plaintiff was repeatedly sexually molested by Zirus while he was attending Camp Stewart.  The molestation has caused minor Plaintiff severe emotional and psychological trauma in the past and he will continue to experience the remainder of his life.  Defendant's own Interviewer's Handbook notes: "child sexual abuse, which can be defined as any touching or other physical contact of a sexual nature with children, is a serious problem that can have lifetime consequences for the victim."  The minor Plaintiff, as a victim of sexual abuse, has suffered and will continue to suffer damages and will need psychological and emotional treatment for the rest of his life.

## G.    Damages

80.    As a direct and proximate result of Defendants' conduct, as set forth above, Plaintiff

is entitled to recover damages from the Defendants as follows:

a.     mental anguish in the past and future;

b.    pain and suffering in the past and future;

c.    medical expenses in the past and future;

d.     physical impairment in the past and future;

e.    exemplary damages, without limitation on the dollar amount of exemplary

damages, *see* Tex. Civ. Prac. & Rem. Code §41.008(c)(5)(6);

f.     reasonable and necessary attorney's fees;

g.     prejudgment and post judgment interest;

h.    costs of court;

i.    such other relief, at law and in equity, to which Plaintiff shall be entitled.

Respectfully submitted,

**SAWICKI LAW**

*/s/ Michael G. Sawicki*

_____

**MICHAEL G. SAWICKI**
State Bar No. 17692500
msawicki@sawickilawfirm.com
**ANDREW A. JONES**
State Bar of No. 24077910
ajones@sawickilawfirm.com
6116 N. Central Expressway, Ste. 1400
Dallas, Texas 75206
(214) 468-8844
(214) 468-8845 (Fax)

**ATTORNEYS FOR PLAINTIFF**